**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

ROBERT RAKES and ROBERT
HOLLANDER, individually and on
behalf of all others similarly situated,

          Plaintiffs,

vs.

LIFE INVESTORS INSURANCE
COMPANY OF AMERICA,

          Defendant.

No. 06-CV-99-LRR

**ORDER**

---

*TABLE OF CONTENTS*

**I.**    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.**   **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    **A.**    *Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    **B.**    *Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**III.**  **STANDARD AND SCOPE OF REVIEW FOR RULE 12(b)(6)** . . . . . . . . . . **4**

    **A.**    *Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    **B.**    *Scope of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        **1.**    *General principles* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        **2.**    *Plaintiffs' exhibits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        **3.**    *Defendant's exhibits and Plaintiffs' objections* . . . . . . . . . . **6**

**IV.**  **FACTUAL ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    **A.**    *Robert Rakes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    **B.**    *Robert Hollander* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    **C.**    *Defendant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        **1.**    *General information* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        **2.**    *Selling and renewing LTC policies* . . . . . . . . . . . . . . . . . . **8**
        **3.**    *The scheme* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

   4.  *Closing the block and the death spiral* . . . . . . . . . . . . . . . . *10*
   5.  *Premium increases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
   6.  *Damages* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

**V. JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*

**VI. SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*

**VII. CHOICE-OF-LAW ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

  A.  *A Comparison of Iowa Substantive Law*
     *and Missouri and Virginia Substantive Law* . . . . . . . . . . . . . . *13*

  B.  *Analysis: Iowa Substantive Law Applies* . . . . . . . . . . . . . . . . . . *14*

**VIII. THE MERITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

  A.  *Moot Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

  B.  *Rule 9(b) Argument* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

**IX. DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *25*

## I. INTRODUCTION

   The matter before the court is Defendant Life Investors Insurance Company of America's Motion to Dismiss ("Motion") (docket no. 38).

## II. PROCEDURAL BACKGROUND

### A. Complaint

   On July 17, 2006, Plaintiffs Robert Rakes and Robert Hollander filed a Class Action Complaint and Jury Demand ("Complaint") (docket no. 3-1) against Defendant. Plaintiffs filed the Complaint on behalf of all others alleged to be similarly situated ("Class"). Plaintiffs' proposed Class is:

> All individuals who purchased, between 1988 and the present, any Golden Care Series, Golden Care Plus Series, Protector Series, Protector II Series, Protector III TQ Series, Future Care Series, Future Care 2 NTQ Series, Future Care 2 TQ Series, Future Care Pool TQ Series; and NEA Group Series

2

Long Term Care insurance policy from [Defendant] or Bankers United Life Assurance Company and whose premiums on those policies were increased at any time after 2000, but excluding from such class, the [D]efendant, any and all officers, directors, employees, and agents of the [D]efendant, their affiliates, and/or subsidiaries who are or have been employed by [D]efendant.

Complaint at 1-2. Upon information and belief, Plaintiffs believe the Class has more than 150,000 members. *Id.* at 22.

The gist of the Complaint is that Defendant fraudulently induced Plaintiffs and the Class to buy certain defective, underpriced long-term care insurance policies ("LTC policies") with the intent to raise the premiums of such policies at a later date. Generally speaking, a LTC policy "provide[s] coverage for a wide range of maintenance and health services for the elderly who need assistance in daily living." *Id.* at 4-5. "The purpose of [a LTC policy] is to provide policyholders with coverage for long term nursing home care, assisted living, home health care, and/or other related care." *Id.* at 5.[1]

The Complaint contains six counts. In Count I, Plaintiffs allege "Actual Fraud." In Count II, Plaintiffs allege "Constructive Fraud." In Count III, Plaintiffs allege "Tortious Breach of Implied Covenant of Good Faith and Fair Dealing (Bad Faith)." In Count IV, Plaintiffs allege "Punitive Damages." In their Request for Relief, Plaintiffs ask the court to (1) certify the action as a class action of the proposed Class; (2) designate Plaintiffs as the representatives of the Class; and (3) award "economic and non-economic damages in excess of $5,000,000.00," punitive damages and attorney fees, costs and interest. *Id.* at 34.

---

[1] LTC policies are designed "to provide families with 'affordable options for dealing with the catastrophic expenses of nursing home care, home care, assisted living, and other forms of long-term care services.'" *Gunson v. James*, 364 F. Supp. 2d 455, 458 (D.N.J. 2005) (quoting S. Rep. No. 106-34, 2000 WL 970179, at *29). Standard health insurance policies generally do not cover long-term care. *Id.*

3

### B. Motion

On September 20, 2006, Defendant filed the Motion, pursuant to Federal Rule of Civil Procedure 12(b)(6). On November 1, 2006, Plaintiffs filed a Resistance. On November 17, 2006, Defendant filed a Reply. On January 8, 2007, Defendant filed a Supplemental Reply. On January 12, 2007, Plaintiff filed a Supplemental Resistance. On January 24, 2007, Defendant filed a Second Supplemental Reply. On February 2, 2007, Plaintiff filed a Second Supplemental Resistance.

On July 20, 2007, the court held oral argument on the Motion. Attorney Allan Kanner represented Plaintiffs. Attorneys Reid Ashinoff and Deborah Renner represented Defendant. The Motion is fully submitted and ready for decision.

### III. STANDARD AND SCOPE OF REVIEW FOR RULE 12(b)(6)

#### A. Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes the district court to dismiss a claim if the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In assessing a motion to dismiss, the court is required to view the allegations in the complaint in the light most favorable to the nonmoving party. *In re Operation of Mo. River Sys. Litig.*, 418 F.3d 915, 917 (8th Cir. 2005). The court must accept all the factual allegations in the plaintiff's complaint as true. *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (citing in part *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002)). The court may "dismiss the case only when it appears beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claim which would entitle [the plaintiff] to relief." *Mo. River Sys. Litig.*, 418 F.3d at 917 (internal quotations omitted). "The issue is not whether the plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). Thus, "as a practical matter, [dismissal under Rule 12(b)(6) is likely to be

4

granted] only in the unusual case in which a plaintiff includes allegations that show, on the face of the [complaint], that there is some insuperable bar to relief." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (quoting *Frey v. Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)).

## B. Scope of Review

### 1. General principles

A court reviewing a motion to dismiss generally considers only the factual allegations in the Complaint. *See, e.g., Riley v. St. Louis County of Mo.*, 153 F.3d 627, 629 (8th Cir. 1998). If the court considers matters outside the Complaint, Rule 12(b) ordinarily directs the court to treat the motion to dismiss as a motion for summary judgment "as provided in Rule 56." Fed. R. Civ. P. 12(b). Upon conversion of a motion to dismiss into a motion to summary judgment, however, the court is required to afford "all parties . . . reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Id.*

### 2. Plaintiffs' exhibits

With the permission of the court, Plaintiffs attached four sealed exhibits to the Complaint: Plaintiffs' Exhibit A, Rakes's Application and LTC Policy (docket no. 15-1); Plaintiffs' Exhibit B, Hollander's Application and LTC Policy (docket no. 15-2); Plaintiffs' Exhibit C, the March 13, 2004 Letter and FAQ from Defendant to Rakes (docket no. 15-4); and Plaintiffs' Exhibit D, the June 16, 2005 Letter and FAQ from Defendant to Hollander (docket no. 15-5). The court considers these four sealed exhibits without converting the Motion into a motion for summary judgment, because they are deemed to be part of the Complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *see, e.g., Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (holding that the district court did not err in considering exhibits attached to complaint when ruling under Rule 12(b)(6)).

5

### 3. *Defendant's exhibits and Plaintiffs' objection*

In their Resistance, Plaintiffs complain that Defendant relies on extraneous materials in the Motion: Defendant's Exhibits A, B and C. Plaintiffs contend that Defendant is attempting to convert the Motion into a motion for summary judgment and any such conversion would severely prejudice them absent the opportunity to conduct discovery. Plaintiffs do not dispute the authenticity of any of the three exhibits.

Defendant attached three exhibits to the Motion. Defendant's Exhibit A is a "Long-Term Care Insurance Personal Worksheet," which is part of Mr. Hollander's application file for LTC insurance with Defendant. Defendant's Exhibit B is a public record from Virginia, which details the Commonwealth of Virginia State Corporation Commission's decision to approve Defendant's LTC insurance rate increases. Defendant's Exhibit C is a public record from Missouri, which details the State of Missouri Division of Market Regulation's decision to approve Defendant's rate increases.

The court's decisions in the instant Order render any reliance on Defendant's Exhibits A, B and C unnecessary. Therefore, Plaintiffs' objection to the court's consideration of such evidence shall be denied as moot. Alternatively, the court would deny the objection on its merits, because the court may consider Defendant's Exhibits A, B and C without converting the Motion into a motion for summary judgment. Defendant's Exhibit A is admissible, because it is part of Hollander's application file, upon which he bases his portion of the Complaint and which Plaintiffs failed to attach to the Complaint. *See, e.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("A plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so.") (cited with approval in *Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063 n.3 (8th Cir. 2005)). Indeed, Hollander signed Defendant's Exhibit A on June 15, 2001—the very same date that the Complaint alleges

6

that he completed his application for LTC insurance with Defendant.  *See* Complaint at 3.
Defendant's Exhibits B and C are admissible, because they are public records.  *See., e.g.,*
*Stahl v. USDA*, 327 F.3d 697, 700 (8th Cir. 2003) (holding that the district court may
consider public records on a motion to dismiss).

## IV.  FACTUAL ALLEGATIONS

Accepting all of the factual allegations in the Complaint as true, the facts are these:

### A.  Robert Rakes

Robert Rakes was born in 1934.  At all relevant times, Rakes lived in McLean,
Virginia.

In 1994, Rakes bought one of Defendant's LTC policies, the "Future Care 2 NTQ
Series, Form LI-LTCP(VA) 192."  This LTC policy, which was "guaranteed renewable,"
initially required Rakes to pay an annual premium of $1,006.20.  In 2003, Defendant
increased Plaintiff's annual premium by 40% to $1,408.68.  In 2005, Defendant sought
to increase Plaintiff's annual premium by an additional 35% to $1,901.72.

### B.  Robert Hollander

Robert Hollander was born in 1939.  At all relevant times, Hollander lived in Creve
Coeur, Missouri.

In 2001, Hollander bought one of Defendant's LTC policies, the "NEA Group
Series, Form GC001 796."  This LTC policy, which was "guaranteed renewable," was
issued through the National Education Association and underwritten by Defendant.  It
required Hollander to pay an annual premium of $1,368.00.  In 2005, Defendant increased
Hollander's annual premium by 35% to $1,846.80.

### C.  Defendant

#### 1.    General information

Defendant is an Iowa corporation that is engaged in the sale of insurance products.

Defendant's headquarters is located in Cedar Rapids, Iowa.[2]

### 2. *Selling and renewing LTC policies*

Beginning in about 1990, Defendant developed, marketed and sold LTC policies. Defendant sold and renewed the LTC policies to Plaintiffs and the Class with the uniform written representation that those policies were "guaranteed renewable." In other words, Life Investors represented to Plaintiffs and the Class that the LTC policies would remain in force, so long as they paid their annual premiums. For example, in Rakes's application, Defendant advised policyholders:

**THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE. WE HAVE A LIMITED RIGHT TO CHANGE PREMIUMS.**

Your timely payment of premiums is all that is needed to keep this Policy in force until benefits have been exhausted. We cannot cancel or refuse to renew this Policy. Your premiums will not increase due to a change in Your age or health. We can, however, change Your premiums based on Your premium class. Premium changes will only be made as of any anniversary of the Policy's Effective Date. We must give You at least 31 days written notice before We change Your premiums.

Pl.'s Ex. A (docket no. 15-1), at 4 (emphasis in original). Similarly, in Hollander's application, Defendant stated:

**INSURANCE CERTIFICATE
GUARANTEED CONVERTIBLE TO
GUARANTEED RENEWABLE
PREMIUMS SUBJECT TO CHANGE**

Pl.'s Ex. B (docket no. 15-2), at 9 (emphasis in original).

---

[2] Defendant is a wholly owned subsidiary of AEGON USA, Inc., which, in turn, is held by AEGON N.V. AEGON N.V. is a Dutch corporation. Its headquarters is located in The Hague, The Netherlands.

8

### 3.    *The scheme*

Despite Defendant's representations to Plaintiffs and the Class that their LTC policies were "guaranteed renewable," such policies were, in fact, defective from the outset.  Defendant "underpriced" the LTC policies, which means that the original premiums for the policies were not sufficient to support future claims.  Specifically, Defendant (1) set the lapse rates[3] of the LTC policies too high and (2) failed to obtain any health verifications from potential policyholders' physicians, thereby allowing high-risk individuals to make claims shortly after the purchase of their policies.

Defendant's underpricing of its policies gave Defendant a market advantage and enabled it to generate a high volume of policy sales.  At the same time, however, Defendant consequently underfunded the LTC policies' reserves below levels necessary to generate income sufficient to pay future claims.

From the outset, Defendant planned to pass the cost of the defective underpricing back to Plaintiffs and the Class through subsequent premium increases.  Defendant knew that the initial premiums under which it sold the LTC policies to Plaintiffs and the Class were unreasonably low and would not support future claims.  Defendant knew that this defective condition would mean that the original premiums for the LTC policies would not be sufficient to support future claims and planned to pass that cost onto Plaintiffs and the Class.  Defendant hid its plan from Plaintiffs and the Class, in order to induce Plaintiffs and the Class to purchase and renew these seemingly lower-priced LTC policies, instead of purchasing alternative LTC insurance policies or no LTC insurance at all.  At no time prior to purchasing or renewing their LTC policies did Plaintiffs or the Class know about Defendant's plan.  When Defendant finally attempted to raise the premiums of Plaintiffs

---

[3] A lapse rate anticipates the number of policyholders who will stop paying premiums and let their policies terminate each year. Assuming that a larger group of policyholders will pay premiums and then allow their policies to lapse allows an insurance company to charge a lower premium.  These are known as "lapse supported" premiums.

and the Class, Defendant based its decisions solely on technical results,[4] not financial results.[5]

Defendant affirmatively represented to Plaintiffs and the Class that the LTC policies were valuable and developed and priced by expert actuaries. Defendant affirmatively represented to Plaintiffs and the Class that the LTC policies were priced at levels designed to accumulate sufficient reserves that were adequate to pay valid claims thereon. Defendant affirmatively represented to Plaintiffs and the Class that Defendant adequately priced the LTC polices to reveal foreseeable future risks inherent in the policy contracts. Defendant affirmatively represented to Plaintiffs and the Class that the policies would be affordable for life. Defendant did not disclose that premium rate increases were planned.

### 4. *Closing the block and the death spiral*

In 2005, Defendant ceased selling the LTC policies, an act known in the insurance industry as "closing the block" of business. By "closing the block," Defendant capped its pool of insureds under these policies and barred new insureds from purchasing LTC policies.

When an insurance company fails to properly price a LTC policy and fails to properly establish reserves for a block of LTC insurance business, closing the block can lead to a vicious cycle, known in the insurance industry as a "selection spiral" or "death spiral." Closing the block guarantees that the premium rates on the LTC policies will increase at a greater rate. Closing the block is particularly significant in LTC insurance situations, where the pool is largely comprised of senior citizens. Policyholders in the

---

[4] Technical results are the balance between products sold (principally insurance premiums) and expenses directly associated with insurance per se (principally claims and administrative expenses).

[5] Financial results are the income generated by the insurance company's investment of the collected insurance premiums over time.

10

closed block are forced to pay the higher premiums that arise from such block closings or risk losing their LTC coverage, because their advanced age and/or medical history prevents them from obtaining LTC insurance elsewhere. Further, such senior citizens experience "shock lapse," when younger and healthier LTC insureds drop their LTC policies and seek more affordable coverage elsewhere. This depletes the insurance pool and inevitably leads to additional premium increases to cover the needs of the remaining elderly and infirm policyholders. Defendant never disclosed the negative ramifications of closing the block to Plaintiffs and the Class.

### 5.    *Premium increases*

Subsequently, Defendant increased the premiums on the LTC policies of the Plaintiffs and Class. In 2001, Defendant increased the premiums on a number of the policies by anywhere from 20% to 30%. In 2003, Defendant increased the premiums on a number of its policies by 35% to 40%. In 2005, Defendant sought a nationwide premium increase of 35% on all 150,000 policyholders. Defendant lumped all of these policies and policyholders into one class regardless of whether the policy was marketed as an individual or group policy, whether the policy or policyholder had suffered a prior premium increase or when the block of business for that particular policy had been closed. A number of these increases were cumulative. The increases served to pass the costs of Defendant's initial underpricing of the policies directly onto its policyholders. Defendant knew that such a course of action would be necessary from the time that it began selling such LTC policies.

### 6.    *Damages*

As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class incurred damages. They were required to pay premium increases or give up their LTC coverage altogether, despite their years of paid premiums. If they had known about Defendant's plan, they would not have purchased or renewed their policies.

## V. JURISDICTION

The court has subject-matter jurisdiction over this potential class-action under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005). CAFA confers federal jurisdiction in a potential class-action "where, among other things, 1) there is minimal diversity; 2) the proposed class contains at least 100 members; and 3) the amount in controversy is at least $5 million in the aggregate." *Plubell v. Merck & Co.*, 434 F.3d 1070, 1071 (8th Cir. 2006) (citing 28 U.S.C. § 1332(d)). These conditions appear to be met here. It does not matter that the court has not entered a class certification order. *See* 28 U.S.C. § 1332(d)(8) ("This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that claim.").

## VI. SUMMARY OF ARGUMENT

In the Motion, Defendant argues that the court must apply Missouri and Virginia law to Plaintiffs' claims. On the assumption that Missouri and Virginia law applies, Defendant argues that (1) "the filed-rate doctrine," which exists in Missouri and Virginia, applies and is a complete defense to all four counts in the Complaint; (2) Plaintiffs' bad-faith and punitive-damages claims fail to state claims upon which relief may be granted, because these are not causes of action in either Missouri or Virginia; (3) the Virginia statue of limitations bars all of Rakes's claims; and (4) under Missouri law, Hollander cannot show that he reasonably relied on Defendants misstatements and omissions. In the alternative, Defendant argues that Plaintiffs have "deficiently pled" all four counts, because they have not stated their allegations of fraud with sufficient particularity, in violation of Federal Rule of Civil Procedure 9(b). Defendant asks the court to dismiss the Complaint in its entirety with prejudice.

In the Resistance, Plaintiffs argue that Iowa law applies to their claims. On the assumption that Iowa law applies, Plaintiffs argue that (1) the filed-rate doctrine does not apply; (2) their bad-faith and punitive-damages claims state claims upon which relief may

12

be granted, because they are causes of action in Iowa; (3) Plaintiffs claims are not barred under any statute of limitations; and (4) Hollander can show that he reasonably relied on Defendant's misstatements and omissions. Plaintiffs also assert that they have complied with Rule 9(b). Plaintiffs ask the court to deny the Motion in its entirety.

## VII. CHOICE-OF-LAW ANALYSIS

The fighting issue before the court is whether to apply the substantive law of Iowa or the substantive law of Missouri and Virginia to Plaintiffs' claims. However, "'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.'" *Phillips v. Marist Soc'y of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) (quoting *Barron v. Ford Motor Co. of Can., Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992) (Posner, J.)). Therefore, before examining the conflict-of-laws issue in this case, the court examines whether there are relevant differences between Iowa substantive law and Missouri and Virginia substantive law.

### A. A Comparison of Iowa Substantive Law and Missouri and Virginia Substantive Law

After examining the parties' briefs and the relevant law, the court agrees with the parties that there are many important and relevant differences between Iowa substantive law and Missouri and Virginia substantive law. The lone exception is that, under Iowa, Missouri and Virginia substantive law, "Punitive Damages" is not a cause of action. *See, e.g., Burke v. Deere & Co.*, 6 F.3d 497, 511 (8th Cir. 1993) ("[T]here is no separate cause of action for punitive damages under Iowa law . . . ."); *Scott v. Gen. Cas. Ins. Co.*, 662 N.W.2d 373, No. 01-0338, 2003 WL 288959, *5 (Iowa Ct. App. Feb. 12, 2003) (unpublished table disposition) ("Punitive damages are merely incidental to the main cause of action, and do not constitute an independent cause of action." (citing *Campbell v. Van Rockel*, 347 N.W.2d 406, 410 (Iowa 1984)); *Klein v. Gen. Elec. Co.*, 728 S.W.2d 670, 671 (Mo. Ct. App. 1987) ("A punitive damage claim is not a separate cause of action; it

13

must be brought in conjunction with a claim for actual damages."); *Zedd v. Jenkins*, 74 S.E.2d 791, 793 (Va. 1953) ("The general rule is that a plaintiff cannot maintain an action to recover mere punitive or exemplary damages . . . ."); *Eslami v. Global One Commc'ns, Inc.*, 48 Va. Cir. 17, 25 (Va. Cir. Ct. 1999) ("[P]unitive damages are not a cause of action, but a remedy."); *see also Byrne v. Nezhat*, 261 F.3d 1075, 1093 n.34 (11th Cir. 2001) ("[A] prayer for punitive damages is not an independent cause of action. Instead, certain causes of action . . . may provide for the recovery of punitive . . . damages."). Therefore, regardless of which substantive law applies, Count IV fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

Accordingly, the court shall grant the motion in part and dismiss Count IV with prejudice. However, such dismissal does not affect Plaintiffs' right to seek punitive damages as a remedy for Defendant's alleged violations of Count I, Count II or Count III. Plaintiffs properly request punitive damages as remedy for Defendant's alleged fraudulent conduct elsewhere in the Complaint. *See* Complaint at 34.

### B. *Analysis: Iowa Substantive Law Applies*

With respect to the other issues in the case, the parties agree that the court must apply Iowa's choice of law rules to determine which substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941) (holding that the conflict of laws rules to be applied by federal courts sitting in a state must be those rules utilized by that state's courts); *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621 (8th Cir. 2004) ("The district court, in determining which state's substantive law governed, should have applied the forum state's conflict-of-laws rules, as opposed to simply applying the forum state's substantive law. In other words, the district court should have given effect to what is called the whole law of the forum."). "Iowa has abandoned the *lex loci delicti* rule in which the law of the place of injury governs every issue in a tort action." *Veasley*, 553 N.W.2d at 897; *see Judge v. Clark*, No. 05-1219, 2006 WL 3313794, *4 (Iowa Ct. App.

14

Nov. 16, 2006) (same). Instead, the Iowa Supreme Court "now follow[s] the [Restatement (Second) Conflict of Laws (1971) ("Restatement")]'s 'most significant relationship' methodology for choice of law issues." *Veasley*, 553 N.W.2d at 897; *see also Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987) (noting "Iowa has adopted the 'modern' choice of law rules, formulated in accordance with the [Restatement]," which includes the "most significant relationship" test). "The theory behind this approach is that rather than focusing on a single factor, 'the court of the forum should apply the policy of the state with the most interest in the litigants and the outcome of the litigation.'" *Veasley*, 553 N.W.2d at 897 (quoting *Fuerste v. Bemis*, 156 N.W.2d 831, 834 (Iowa 1968)).

The most significant relationship test is found in § 145 of the Restatement. *Id*. at 897-98. Section 145 provides:

> (1)    The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2)    Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a)    the place where the injury occurred,
> (b)    the place where the conduct causing the injury occurred,
> (c)    the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d)    the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement § 145; *see also id*. § 148(1). In turn, § 6 of the Restatement provides:

15

(1)    A court, subject to constitutional restrictions, will
follow a statutory directive of its own state on choice of
law.

(2)    Where there is no such directive, the factors relevant to
the choice of the applicable rule of law include:

(a)    the needs of the interstate and international
systems,
(b)    the relevant policies of the forum,
(c)    the relevant policies of other interested states and the relative
interests of those states in the determination of the particular
issue,
(d)    the protection of justified expectations,
(e)    the basic policies underlying the particular field of law,
(f)    certainty, predictability and uniformity of result, and
(g)    ease in the determination and application of the law to be
applied.

*Id.* at § 6.

After considering all of the foregoing principles, the court holds that Iowa law applies. The court's reasons are adequately set forth in Plaintiffs' Resistance. Two relatively recent district court cases, *Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101 (S.D. Iowa 1998) (Pratt, J.) and *Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872 (N.D. Iowa 1999) (Melloy, C.J.) are instructive. As in the case at bar, both *Grove* and *Cunningham* were class actions against Iowa insurers that primarily sounded in tort.

In *Grove*, out-of-state plaintiffs filed a class-action complaint against an Iowa insurer. 14 F. Supp. 2d at 1104. The complaint included various tort claims, including fraud, fraudulent concealment, fraudulent inducement, breach of fiduciary duty and negligence. *Id.* at 1104 n.1. The plaintiffs alleged that the insurer fraudulently "deceived and induced them and thousands of other policy holders to purchase life insurance policies through the use of false and misleading policy illustrations, marketing materials, and sales presentations." *Id.* at 1104. Specifically, the plaintiffs alleged that the insurer devised a

Case 1:06-cv-00099-LRR    Document 68    Filed 07/20/07    Page 16 of 25

defective "vanishing premium" policy, in order to induce plaintiffs to buy their life insurance policies. *Id.*

In deciding whether to apply the substantive law of Iowa or the substantive law of the various plaintiffs' forum states, the court wrote:

> [T]he Court is persuaded by plaintiffs' argument that Iowa law should apply. Although it is clear that both named plaintiffs were residents of Florida when they negotiated and contracted for the purchase of Principal insurance policies, the Court finds that the other three factors suggest that Iowa has more significant contacts with all claims in this litigation.
>
> Neither party disputes that Principal is incorporated in, and has it's [sic] principal place of business in Iowa; the insurance policies are underwritten in Iowa; and the sales presentation materials were designed and prepared in Iowa. Additionally, plaintiffs allege that Iowa is the state from which the alleged nationwide fraudulent scheme was orchestrated. The Court finds that any alleged fraud or negligence occurred in Iowa. Further, although Willick is still a resident of Florida, the Groves are no longer domiciled there; they are now citizens and residents of Louisiana. Because the two named plaintiffs currently reside in separate states, the Court is further persuaded that Iowa, as the state of Principal's citizenship, has the more significant contacts with the litigation. Finally, the Court finds that the place of performance of the contract and the location of the subject matter of the contract is more likely to be in Iowa. Any money collected from the insureds is likely to be kept at banks in the state of Iowa, and any money paid out as insurance proceeds will be paid from Iowa. Following the [Restatement], it is clear to this Court that Iowa has the most significant relationships to all of the claims in the litigation. Finally, the Court notes that Iowa has a significant interest in the litigation because it has an interest in protecting any of its citizens who purchase life insurance here and providing a fair trial to its citizens who are incorporated here. Therefore the Court will apply Iowa law.

17

*Id.* at 1106-07 (citations and footnote omitted). The district court noted that "the fact that this action has been filed as a class action which potentially could include plaintiffs from many of the fifty states, further supports its determination that Iowa has the most significant contacts." *Id.* at 1107 n.6.

In *Cunningham*, out-of-state plaintiffs filed a class-action complaint against an Iowa insurer. 42 F. Supp. 2d at 878. The complaint included various tort claims, including fraud, breach of fiduciary duty and negligent misrepresentation. *Id.* at 878 n.2. The gist of the plaintiffs' complaint was that the insurer engaged in a "systematic scheme of marketing fraud" whereby it unlawfully induced the plaintiffs to purchase certain whole life insurance policies. *Id.* at 879.

In deciding whether to apply the substantive law of Iowa or the substantive law of the named plaintiffs' forum states, then-Chief Judge Melloy discussed *Grove* and wrote:

> Although the Plaintiffs purchased the insurance in Florida and Missouri, a substantial portion of the fraudulent conduct occurred in Iowa. The principal place of business for AEGON and its subsidiaries involved in the scheme is Cedar Rapids, Iowa, and all of the Defendants are Iowa corporations. The marketing and sales scheme originated in the corporate offices of AEGON and its subsidiaries in Cedar Rapids. The management-level decisions and policies pertaining to sales practices issued from Iowa. Iowa's interest in regulating the manner in which Iowa insurance companies do business is clear. Finally, the Court notes that as in *Grove*, the Plaintiffs are residents of different states. Since the contacts are split between two states (Florida and Missouri), the contacts with Iowa become even more significant, and the importance of the non-Iowa contacts is diluted. This list of contacts provides compelling evidence that favors the application of Iowa law. Therefore, the Court will apply Iowa law to the conspiracy claim.

*Id.* at 883-84 (citations omitted).

The reasoning of *Grove* and *Cunningham* applies with equal force here. Defendant

is an Iowa corporation. Defendant's home office is in Cedar Rapids, Iowa. Such home office is listed on both Plaintiffs' Exhibit A, Rakes's application and LTC policy, and Plaintiffs' Exhibit B, Hollander's application and LTC policy. Every indication from the Complaint is that Defendant's fraudulent scheme originated from or was ratified by the highest levels of Defendant's organization; it is more reasonable to conclude that Defendant's actions occurred at Defendant's home office in Iowa, as opposed at some insurance agent's office in Missouri or Virginia. In any event, Iowa has a strong interest in regulating the manner in which Iowa insurance companies do business. Further, as in *Grove* and *Cunningham*, Rakes and Hollander are residents of different states. Because the non-Iowa contacts are split between Missouri and Virginia, the contacts with Iowa become even more significant, and the importance of the non-Iowa contacts is diluted. Accordingly, the court finds that Iowa has the most significant relationship to the case.

Defendant rejoins that *Grove* and *Cunningham* are no longer good law, in light of the Eighth Circuit Court of Appeals's subsequent decision in *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005). Plaintiff claims that *In re St. Jude Medical* abrogated *Grove* and *Cunningham*, insofar as those courts considered the so-called "dilution factor," *i.e.*, weighed the fact that the plaintiffs came from different states against application of those states' substantive laws to the respective plaintiffs.

In *St. Jude Medical*, the district court applied Minnesota law in a consolidated and certified products liability class action against the manufacturer of certain prosthetic heart valves. 425 F.3d at 1118-19, 1120-21. The Eighth Circuit Court of Appeals reversed and remanded the district court's decision to apply Minnesota law, because the district court conducted a "cursory" and non-individualized conflicts-of-law analysis. *Id.* at 1119. The court held that "an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action." *Id.* at 1120 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822-23 (1985)). The Court reiterated the long-standing maxim that a state's choice-

19

of-law rules must be applied in a constitutional manner: namely, "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.* The court expressed some doubt as to whether Minnesota law would apply on remand, because there was "no indication out-of-state parties 'had any idea that [Minnesota] law could control' potential claims when they received their [heart] valves." *Id.* (quoting *Phillips Petroleum*, 472 U.S. at 822). On remand, the district court conducted a more thorough conflicts-of-law analysis and held again that Minnesota law applied. *In re St. Jude Med., Inc.*, No. 01-1396, 2006 WL 2943154, *3-*4 (D. Minn. Oct. 13, 2006).

After reviewing *St. Jude Medical*, the court disagrees with Defendant's contention that *St. Jude Medical* somehow casts doubt on the validity of the analysis in *Grove* and *Cunningham*. The Eighth Circuit Court of Appeals did not break new ground in *St. Jude Medical*; indeed, it was not analyzing the Restatement's significant relationship test. Rather, the Eighth Circuit Court of Appeals simply restated long-standing Supreme Court precedent, expressed in cases such as *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) and *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), which hold that the decision to apply a state's choice-of-law rules in a class-action lawsuit cannot run afoul of the United States Constitution.[6] In those cases, which predated *Grove* and *Cunningham*, the Supreme Court held that the state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class . . . in order to ensure that the choice of [its] law is not arbitrary or unfair." *Phillips*, 472 U.S. at 821-22 (quoting *Allstate*, 449 U.S. at 312-13)). *St. Jude Medical* simply restated and applied these

---

[6] The chief defect of Defendant's argument is that it conflates the constitutional analysis of *St. Jude Medical* with the significant relationship test of *Grove* and *Cunningham*.

familiar principles. Nothing in *St. Jude Medical* indicates that the court cannot consider the dilution factor. So long as the court examines the alleged unfairness or arbitrariness of applying a given state's substantive law to each individual plaintiff in light of each individual plaintiff's contacts with such state, the court does not run afoul of *St. Jude Medical*. In other words, the court may consider the fact that a plaintiff is only one of many plaintiffs when examining the nature and quality of that plaintiff's contacts with a given state *and* at the same time analyze that plaintiff's contacts from an individual perspective.

On the constitutional issue itself, *St. Jude Medical* is distinguishable. First, in the case at bar the court has not yet certified Plaintiffs as class representatives. Therefore, nothing in this order may be construed as a non-individualized choice-of-law determination that binds all 150,000 putative members of the Class. *See Cunningham*, 42 F. Supp. 2d at 883 ("[I]t is important to note that at this point in the litigation, the Court has not certified the Plaintiffs as class representatives. Accordingly, the Court will not make a choice of law determination that will bind the putative class in this Order. This Order only contemplates the claims of the named Plaintiffs . . . .").[7] Second, the court has conducted an individualized choice of law analysis with specific reference to Hollander and Rakes: the court has considered the specific situation of each and nonetheless holds that Iowa substantive law applies to both of them. Unlike *St. Jude Medical*, there is a clear indication in the record that Hollander and Rakes knew or should have known that Iowa law could control their claims. Each plaintiff's application and LTC policy indicates that Defendant's home office was in Cedar Rapids, Iowa. *See* Pl.'s Ex. A at 2, 4; Pl.'s Ex. B at 2, 9. For this reason, the application of Iowa law to Hollander and Rakes is neither

---

[7] The choice of law analysis is also tentative in another respect: discovery may convince the court that another state's laws should apply. Counsel for Defendant avers that if any fraud occurred, it occurred in Texas and that discovery will show that all decisions regarding Defendant's fraudulent scheme were made in Texas.

Case 1:06-cv-00099-LRR   Document 68   Filed 07/20/07   Page 21 of 25

arbitrary nor fundamentally unfair.

Accordingly, the court shall apply Iowa law to the Complaint with respect to Plaintiffs.

## VIII.  THE MERITS

### A.  Moot Arguments

With the exception of Defendant's Rule 9(b) argument, the remainder of Defendant's arguments in the Motion are premised upon an assumption that the law of Virginia or Missouri law applies to Plaintiffs' claims.  Accordingly, the court shall deny in part the Motion as moot.

### B.  Rule 9(b) Argument

Defendant asserts that Plaintiffs have failed to plead their fraud claims with sufficient particularity as required by Federal Rule of Civil Procedure 9(b).  Plaintiffs respond that their fraud claims are sufficient to meet the standards of Rule 9(b).

Federal Rule of Civil Procedure Rule 9(b) provides:

> **(b)  Fraud, Mistake, Condition of the Mind**.  In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b) (emphasis in original).  The plain language of Rule 9(b) "requires a plaintiff to allege with particularity the facts constituting the fraud."  *Indep. Bus. Forms v. A-M Graphics, Inc.*, 127 F.3d 698, 702 n.2 (8th Cir. 1997).  A plaintiff may not make "conclusory allegations."  *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir. 1997).  Conclusory allegations are insufficient because "one of the primary purposes of this rule is to facilitate a defendant's ability to respond to and to prepare a defense to charges of fraud."  *Greenwood v. Dittmer,* 776 F.2d 785, 789 (8th Cir. 1985).

"To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well

22

as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). In other words, Rule 9(b) demands that Plaintiffs "identify who, what, where, when, and how."

The Eighth Circuit Court of Appeals has cautioned that Rule 9(b) is to be interpreted "'in harmony with the principles of notice pleading.'" *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). "Although a pleading alleging fraud need not provide anything more than notice of the claim, it must contain 'a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct.'" *Id.* (quoting *Abels*, 259 F.3d at 920). For example, when alleging fraudulent misrepresentation, Rule 9(b) requires a plaintiff to plead the circumstances constituting the fraud with particularity, while knowledge and intent may be pled generally. *See Bennett v. Berg,* 685 F.2d 1053, 1062 n.12 (8th Cir. 1982) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

After considering the arguments of the parties and Plaintiffs' thirty-five page Complaint, the court holds that Plaintiffs have satisfied Rule 9(b)'s particularity requirement. Plaintiffs' specific allegations of fraud are primarily discussed at length in Part IV of this order and need not be repeated here. Further, Plaintiffs' Complaint also specifically alleges that Defendant made a number of fraudulent statements and omissions to Plaintiffs and the Class in connection with its decision to increase premiums. According to Plaintiffs, Defendant made the following fraudulent statements:

In 2004 and 2005, Defendant sent all of its policyholders a letter and a document entitled "FAQ." In the letter and the FAQ, Defendant made a number of false and fraudulent statements to Plaintiffs and the Class: namely, (1) "We make every effort to

23

provide quality coverage at reasonable and affordable premium rates."; (2) "However, sometimes claims significantly exceed anticipated levels."; (3) "The company has the right to adjust your premiums in accordance with the terms of the policy"; and (4) "When long term care insurance policies like yours were originally filed and approved there was limited actuarial and claims experience data available that could provide an accurate forecast of how the actual experience would develop." Pl.'s Ex. C (docket no. 15-4), at 2-4 (Rakes); Pl.'s Ex. D (docket no. 15-5), at 2-4 (Hollander).[8] These statements ignored Defendant's plan to increase the premiums of the policies and, in turn, made Defendant's claim in the policies themselves that they were "guaranteed renewable" fraudulent.

According to Plaintiffs, Defendant made the following fraudulent omissions:

At no time did Defendant inform Plaintiffs and the Class that (1) the LTC policies were underfunded; (2) the LTC policies were based on actuarial data that was ignored, faulty, limited, or incomplete; (3) Defendant knew that the LTC policies were underfunded and intended from the outset to seek premium increases later on; (4) Defendant planned to close the block and knew that the closed block would experience a selection spiral or death spiral; (5) Defendant was intentionally raising its premiums in order to obtain windfall profits by forcing the insureds to drop the LTC policies and thereby permit Defendant to avoid future claims; (6) Defendant intended to pass any risk of loss due to the defective underpricing of the LTC policies to Rakes, Hollander and the Class in the form of higher premiums.

In sum, the court holds that Plaintiffs have pled the who, what, where, and how of

---

[8] For example, Plaintiffs claim that Defendant's statement that it would "make every effort to provide quality coverage at *reasonable and affordable premium rates*" was false, because it ignored the fact that the policies were originally underpriced. Emphasis added.). Defendant's statement that "sometimes *claims significantly exceed anticipated levels*" is false to the extent it implied that higher than expected claims experience was the reason for the premium increase. (Emphasis added.). The reason for the premium increase was not high claims, but underpriced policies.

Case 1:06-cv-00099-LRR   Document 68   Filed 07/20/07   Page 24 of 25

their fraud claims with sufficient particularity.  Accordingly, the court shall deny in part Defendant's Motion as to its Rule 9(b) argument.

### IX.  DISPOSITION

**IT IS THEREFORE ORDERED:**

(1)    Defendant's Motion (docket no. 38) is **GRANTED IN PART AND DENIED IN PART** as set forth herein;

(2)    Counts I, II and III remain for trial;

(3)    Count IV is dismissed with prejudice; and

(4)    Plaintiffs' objection to the court's consideration of Defendant's Exhibits A, B and C is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**DATED** this 20th day of July, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

Case 1:06-cv-00099-LRR   Document 68   Filed 07/20/07   Page 25 of 25