**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| ROBERT RAKES and ROBERT HOLLANDER, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | No. 06-CV-99-LRR |
| vs. | **ORDER** |
| LIFE INVESTORS INSURANCE COMPANY OF AMERICA, | |
| Defendant. | |

_____

### *TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     **RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . **2**

III.    **LEGAL STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . **3**

IV.     **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **4**
    *A.    The Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    *B.    LTC Policies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    *C.    Hollander* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    *D.    Rakes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    *E.    Rate Increases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

V.      **SUMMARY OF THE ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

VI.     **RULE 56(f) MOTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    *A.    Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    *B.    Planned Discovery* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
    *C.    Necessity and Materiality of Plaintiffs' Proposed Merits Discovery* . **14**
        *1.    Defense of disclosure of right to increase premiums* . . . . . . **14**
        *2.    Tort of bad faith* . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
    *D.    Disposition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

VII. **MOTION FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . **17**
    A.    ***Disclosure of Possibility of Rate Increases*** . . . . . . . . . . . . . . . . **18**
        1.    ***Actual fraud*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
        2.    ***Constructive fraud*** . . . . . . . . . . . . . . . . . . . . . . . . **22**
    B.    ***Tort of Bad Faith*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
    C.    ***Disposition*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

VIII. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

## I. INTRODUCTION

There are two matters before the court: (1) Defendant Life Investors Insurance Company of America's Motion for Summary Judgment ("Summary Judgment Motion") (docket no. 145); and (2) the Motion for Continuance Pursuant to Rule 56(f) ("Rule 56(f) Motion") (docket no. 169), filed by Plaintiffs Robert Rakes and Robert Hollander.

## II. RELEVANT PROCEDURAL BACKGROUND

On July 17, 2006, Plaintiffs filed a Complaint (docket no. 3) alleging Defendant fraudulently induced them and all others similarly situated to them to buy certain defective, underpriced long-term care insurance ("LTC") policies with the intent to raise their premiums at a later date. The Complaint sets forth the following three claims: (1) actual fraud; (2) constructive fraud; and (3) "tortious breach of implied covenant of good faith and fair dealing (bad faith)."[1] Complaint at 33.

On September 20, 2006, Defendant filed a Motion to Dismiss (docket no. 38). One of the issues in the Motion to Dismiss was whether Iowa law should apply to Plaintiffs' claims. Defendant contended the court should apply Virginia law to Rakes's claims and Missouri law to Hollander's claims. In the Order on Motion to Dismiss, the court chose to apply Iowa law to Plaintiffs' claims. The court qualified this decision by noting "discovery may convince the court that another state's laws should apply." Order on Motion to Dismiss at 21, n.7.

---

[1] On July 20, 2007, the court dismissed Plaintiffs' claim for "Punitive Damages." *See* Order on Motion to Dismiss (docket no. 68), at 13-14.

On August 16, 2007, the court approved the parties' Amended Rule 16(b) and 26(f) Scheduling Order and Discovery Plan ("Scheduling Order") (docket no. 75). The Scheduling Order bifurcated the discovery process. The first phase of discovery, which ended on December 20, 2007, encompassed "class certification issues and fact discovery as to the Named Plaintiffs." Scheduling Order at 2. The second phase of discovery, which encompasses discovery into the merits of Plaintiffs' claims, "will follow a decision on Class Certification[.]" *Id.* The hearing on class certification is currently scheduled to begin on July 29, 2008. Dispositive motions are due 120 days before the Trial Ready Date, which is "six months after the Court rules on any motion for Class Certification." *Id.* at 3. The Scheduling Order notes "[t]o the extent the discovery sought pertains to both class certification and the merits, such discovery shall not be precluded for that reason alone in the first phase of discovery." *Id.* at 2.

On April 4, 2008, Defendant filed the Summary Judgment Motion and requested oral argument. On May 1, 2008, Plaintiffs filed the Rule 56(f) Motion. On May 12, 2008, Plaintiffs filed their Resistance to the Summary Judgment Motion ("Summary Judgment Resistance") (docket no. 173). On May 14, 2008, Defendant filed a Resistance to the Rule 56(f) Motion ("Rule 56(f) Resistance") (docket no. 176). On May 23, 2008, Defendant filed a Reply (docket no. 188) in support of the Summary Judgment Motion. On May 27, 2008, Plaintiffs filed a Reply (docket no. 192) in support of the Rule 56(f) Motion.

Pursuant to Local Rule 7.c, the court finds the Summary Judgment Motion does not necessitate oral argument at this time and, accordingly, denies Defendant's request for the same. The court finds the Summary Judgment Motion and the Rule 56(f) Motion fully submitted and ready for decision.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows "there is no genuine issue as

to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## IV.  RELEVANT FACTUAL BACKGROUND[2]

Viewing the facts in the light most favorable to Plaintiffs, the relevant facts are:

### A.  The Players

Plaintiff Robert Hollander is a resident of Missouri. Plaintiff Robert Rakes is a resident of Virginia. Defendant is an Iowa corporation with its headquarters in Cedar Rapids, Iowa. Defendant is a wholly-owned subsidiary of AEGON USA, Inc.

### B.  LTC Policies

At all times relevant to the instant action, Defendant sold LTC policies. LTC

---

[2] The Summary Judgment Motion involves a lengthy, detailed series of facts relating to numerous legal arguments. However, for the reasons set forth in Section VII, the court only considers and recites facts relevant to (1) Defendant's disclosure of the possibility of premium increases and (2) the tort of bad faith.

policies are intended to help an insured avoid the financial risk of the need for nursing home care or home health care in the latter part of an insured's life. In determining the appropriate premium rate for a LTC policy, an "insurer needs to know who is going to keep the policy ("persist") and who is not ("lapse") to predict the amount of claims it will have." Summary Judgment Resistance Brief (docket no. 173-1), at 3.

Plaintiffs contend Defendant "low-balled" its pricing by predicting an unrealistically high lapse rate which permitted Defendant to set the LTC premium rates "unrealistically low" to generate sales and gain a market share in the LTC business. *Id.* at 3. Plaintiffs contend Defendant intended to close enrollment on its LTC policies knowing it could raise premiums later. Plaintiffs contend Defendants fraudulently induced Plaintiffs to purchase defective, underpriced LTC policies. Plaintiffs contend Defendants sold them these LTC policies with the intent to later raise the premiums. Plaintiffs allege they suffered damages because they had to "pay premium increases in order to keep their LTC policies in force or give up their LTC coverage altogether." Complaint at ¶ 16.

### C. Hollander

On or about June 15, 2001, Hollander purchased a LTC policy underwritten by Defendant which was **GUARANTEED RENEWABLE FOR LIFE.**" Defendant's Appendix ("Def. App'x"), at 82 (emphasis in original). Hollander purchased his LTC policy through the National Education Association ("NEA"), a labor organization of which he was and remains a member. Lionel William Miller was the third-party agent who sold the LTC policy to Hollander. Mr. Miller met with Hollander and Hollander's wife at the Hollanders' home in Missouri.

Before he purchased his LTC policy, Hollander received a "Personal Worksheet." The Personal Worksheet asks: "Have you considered whether you could afford to keep this policy if the premiums were raised, for example, by 20%?" *Id.* at 659. Hollander signed the Personal Worksheet.

Hollander also received an "Outline of Coverage" from Defendant which provides: "We will not increase [y]our premiums due to a change in [y]our age or health. We can, however, change [y]our premiums based on [y]our premium class." *Id.* at 767. Hollander's insurance certificate ("Certificate") also gave notice of the possibility of an increase in his premium. The front page of the Certificate provides "**PREMIUMS SUBJECT TO CHANGE**." *Id.* at 82 (emphasis in original). The Certificate also states "Premiums will not increase due to a change in [y]our age or health. We can, however, change [y]our premiums based on [y]our premium class. We will give [y]ou at least 30 days written notice before We change [y]our premiums." *Id.* at 87.

Throughout the period of coverage, Defendant sent Hollander annual "Long Term Care Updates." The March 2002 Long Term Care Update states:

> Premium rates can be increased; and you should be prepared to pay for increased rates during the life of your policy. Although we cannot single you out for a rate increase, we can change your premium based on our experience with all our insureds in your state and same premium class.

*Id.* at 662. Hollander is unsure whether he received the March 2002 Long Term Care Update; however, he testified he remembered receiving and produced in discovery other such mailings.

Plaintiffs do not dispute Hollander received any of these disclosures. Further, Hollander testified at his deposition that he knew Defendant had the right to increase his LTC insurance premium. Hollander testified:

> Q: At the time that you purchased your policy in June of 2001, your policy from [Defendant], did you have an understanding as to whether [Defendant] could increase the premiums?
>
> A: There was a reference to it. And I'm sure I asked [Mr. Miller] about it. The reference [was] about your premium class. There was no other—there was no

explanation, nor did I have at the time, in my opinion, I don't think I had an idea at the time as to why [a premium increase] would occur. And in the policy there is no explanation as to why [a premium increase. . .] could occur.

Q:      But you had an understanding that premiums could be increased, correct?

[. . .]

A:      Yes. Yeah.

[. . .]

Q:      But you knew that [Defendant] could—it had the ability to increase the rate. Correct?

A:      Yes.

*Id.* at 377-378 & 382.

In Mr. Miller's deposition, Mr. Miller stated he advised Hollander of the possibility of an increase in his LTC premiums over time. Mr. Miller testified:

Q:      Did you tell [the Hollanders] whether premiums could go up over time?

A:      Yes.

Q:      And what did you say?

A:      Well, I referred to [. . .] an outlined area on the brochure where the reference is made that premiums would not be—or could not be increased due to age or to change in health. They could only be increased within their class.

*Id.* at 526.

## D. Rakes

Rakes purchased his LTC insurance policy from Defendant after meeting with John Moysey, an insurance agent licensed in Virginia. Mr. Moysey met with Rakes several times before Rakes purchased his policy. Rakes's LTC policy was "**GUARANTEED RENEWABLE**." *Id.* at 82 (emphasis in original).

At the time of or prior to Rakes's purchase of his LTC policy from Defendant, he received a number of written disclosures informing him of the possibility of and Defendant's right to increase his LTC insurance premium. One of the documents Rakes received was an advertising brochure from Defendant that stated: "[W]e do reserve the right to adjust future premiums for insureds in a given state who have the same policy form[.]" *Id.* at 774.

During Mr. Moysey's solicitation of Rakes, Mr. Moysey provided Rakes with an Outline of Coverage. The Outline of Coverage states: "I am [. . .] aware that [Defendant] reserves the right to raise the premiums for any class of insureds as a whole." *Id.* at 791.

In the LTC policy Defendant issued to Rakes, the following text appears: "Your premiums will not increase due to a change in [y]our age or health. We can, however, change [y]our premiums based on [y]our premium class." *Id.* at 40.

Following his purchase of LTC insurance from Defendant, Rakes received annual Long Term Care Updates, including the same March 2002 update sent to Hollander, which states:

> Premium rates can be increased; and you should be prepared to pay for increased rates during the life of your policy. Although we cannot single you out for a rate increase, we can change your premium based on our experience with all our insureds in your state and same premium class.

*Id.* at 662 & 1515, ¶¶ 2-4.

Plaintiffs do not dispute Rakes received any of the disclosures outlined above. In

his deposition, Rakes testified he did not believe his premium would increase until he became subject to a premium increase in 2004. Rakes testified:

> Q: Now, when you got this first rate increase which, according to the documentation, is 2004, were you surprised by that rate increase?
>
> A: Yes.
>
> Q: Why were you surprised?
>
> A: I'm not accustomed to insurance rates going up while the policy is in effect.
>
> Q: Okay. Did you know when you purchased your [. . . LTC] insurance from [Defendant] that the premiums could go up?
>
> A: No.

*Id.* at 485.

When asked why he believed his LTC premium would never increase despite all the documentary disclosures indicating otherwise, Rakes testified he "occasionally" looked at the language contained in the literature he received from Defendant, but considered it to be "boilerplate." *Id.* at 510. Rakes stated his general practice involved reviewing the insurance literature provided to him, but his review of this material was "[n]ot thorough[.]" *Id.* at 489. More important, Rakes acknowledged he knew the rates could increase when he testified "Mr. Moysey said the [. . .] only way my rates could go up is if my class changed." *Id.* at 510-11.

### E. Rate Increases

Originally, Rakes's annual LTC premium was $1,006.20. In March of 2004, Defendant notified Rakes it was increasing his annual LTC premium by forty percent to $1,408.68. In March of 2007, Defendant notified Rakes it was increasing his annual LTC

premium by an additional thirty-five percent to approximately $1,901.72. Similarly, Hollander's original annual LTC premium was $1,368.00. In June of 2005, Defendant notified Hollander it was increasing his annual LTC premium by thirty-five percent to approximately $1,846.80. Rakes and Hollander contend the substantial increases to their premiums rendered their LTC policies unaffordable for them.

Plaintiffs believe Defendant increased their LTC premiums because "the high lapse assumptions [Defendant] used to artificially lower the premium on the policy had not borne out and [Defendant] passed the known persistency risk to policyholders through these rate increases." Summary Judgment Resistance Brief at 5-6.

Plaintiffs also contend Defendant knew it had rate increases planned and did not properly disclose its intent to raise the premiums. More specifically, Plaintiffs contend at the time Rakes received his first premium increase notice in March of 2004, Defendant was in the process of planning additional rate increases. Plaintiffs also contend at the time Hollander received his notice of premium increase in 2005 and Rakes received his notice of premium increase in 2007, Defendant was planning additional rate increases for 2008.

Defendant made the following disclosures to Plaintiffs each time Defendant notified Plaintiffs of a rate increase: (1) "We make every effort to provide quality coverage at reasonable and affordable premium rates. However, sometimes claims significantly exceed anticipated levels," Def. App'x 133, 137 & 797; (2) "The company has the right to adjust your premiums in accordance with the terms of the policy," *Id.* at 134, 138 & 798; and (3) "When long term care policies like yours were originally filed and approved there was limited actuarial and claim experience data available that could provide an accurate forecast of how the actual experience would develop." *Id.* at 135, 139 & 799.

## V. SUMMARY OF THE ISSUES

The instant motions raise a number of legal issues for the court's consideration. In the Summary Judgment Motion, Defendant advances the following five arguments: (1) the

filed rate doctrine precludes Plaintiffs' fraud and bad faith claims; (2) because Defendant provided written disclosures to Plaintiffs indicating their rates would increase, Plaintiffs cannot satisfy the "reasonable reliance" element of their fraud claims; (3) Virginia's statute of limitations bars Rakes's fraud claim; (4) ERISA preempts Hollander's fraud, constructive fraud and bad faith claims; and (5) Plaintiffs' claims for "tortious breach of implied covenant of good faith and fair dealing (bad faith)" fail as a matter of law because no applicable law "recognize[s] the tort of bad faith for anything but a denial of a claim for benefits," which Plaintiffs have not alleged. Summary Judgment Motion (docket no. 145-1), at ¶ 12.

Additionally, in its Summary Judgment Brief, Defendant discusses at great length the overriding legal question of choice of law. Defendant argues discovery has revealed Iowa law should not govern Plaintiffs' claims. Defendant contends Virginia law governs Rakes's claims and Missouri law governs Hollander's claims.

In the Rule 56(f) Motion, Plaintiffs ask the court to deny or delay ruling on the Summary Judgment Motion. Plaintiffs contend they have not had an adequate opportunity to conduct discovery essential to resist the Summary Judgment Motion. In the alternative, in the Summary Judgment Resistance, Plaintiffs argue: (1) the filed rate doctrine is inapplicable; (2) Defendant's disclosures of the possibility of rate increases does not defeat Plaintiffs' fraud claims; (3) because Iowa law applies to the claims at issue, Virginia's statute of limitations is inapplicable; (4) Hollander's LTC policy is not governed by ERISA; and 5) the tort of bad faith claim survives summary judgment under Iowa law.

The court first addresses the Rule 56(f) Motion. To the extent necessary, the court shall then address the Summary Judgment Motion.

## VI. RULE 56(f) MOTION

### A. Law

At issue is Federal Rule of Civil Procedure 56(f). Rule 56(f) states:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1)  deny the motion;
> > (2)  order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> > (3)  issue any other just order.

Fed. R. Civ. P. 56(f).  Local Rule 56.h requires Rule 56(f) motions be made "by separate motion, filed within 10 court days after service of the motion for summary judgment, and supported by affidavits[.]"  LR 56.h.

The purpose of Rule 56(f) is "to provide an additional safeguard against an improvident or premature grant of summary judgment[.]"  *United States ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 426 (8th Cir. 2002) (citation and internal quotation marks omitted).  "[T]he rule should be applied with a spirit of liberality."  *Id.*  "Although discovery need not be complete before a case is dismissed, summary judgment is proper only if the nonmovant has had adequate time for discovery."  *Robinson v. Terex Corp.*, 439 F.3d 465, 467 (8th Cir. 2006) (citing *Pony Computer, Inc. v. Equus Computer Sys. of Mo., Inc.*, 162 F.3d 991, 996 (8th Cir. 1996)).  To this end,

> Rule 56(f) allows a party to request a delay in granting summary judgment if the party can make a good faith showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact.

*Id.* (citing Fed. R. Civ. P. 56(f); *Small Bus. Admin. v. Light*, 776 F.2d 394, 397-98 (8th Cir. 1985)).  The party is required "to show 'what specific facts further discovery might unveil.'"  *Casino Magic*, 293 F.3d at 426 (quoting *Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 911 (8th Cir. 1999)).  The decision whether to afford a party relief under Rule 56(f) rests within the sound discretion of the district court.  *See id.* at 426-27

(reviewing for abuse of discretion the trial court's decision refusing the extension of discovery under Rule 56(f)).

## B.  *Planned Discovery*

In the Affidavit of Timothy Q. Purdon in Support of the Rule 56(f) Motion ("Purdon Aff.") (docket no. 169-3), counsel for Plaintiffs avers discovery would lead to specific factual information essential to Plaintiffs' ability to resist the Motion for Summary Judgment. This list of facts is long and need not be repeated here in its entirety. Among other potential facts, counsel for Plaintiffs believes the opportunity to conduct discovery might reveal: Defendant's regulatory filings in all states where LTC policies similar to those purchased by Plaintiffs were sold, which "likely contain information about what the Defendants knew and when they knew it," Purdon Aff. at ¶ 4.A; whether Defendant relied on Iowa's approval of a rate increase filing identical to those filed in other states; Defendant's relationship with Iowa for purposes of choice of law analysis; whether Defendant had knowledge of its "wrongdoing," *Id.*; the relationship between Defendant and the Iowa Department of Insurance; the Iowa Department of Insurance's authority in approving Defendant's LTC premium rates; Defendant's intent as to language in policies concerning Defendant's right to raise premiums; facts relating to Defendant's failure to inform Plaintiffs of its decision to exit the LTC insurance market; the extent to which Defendant disclosed the consequences of Defendant's "decision to underprice [its] LTC policy by using inappropriate lapse assumptions and the plan to shift the risk of this underpricing back to [Plaintiffs]," *Id.* at ¶ 4.C(2); documents establishing Defendant's "intent in supplementing the allegedly 'clear' language in the LTC application and policies concerning [Defendant's] right to raise premium rates" in Defendant's brochures and other documents, *Id.* at ¶ 4.D; information from a meeting in which one of Defendant's representatives reported Defendant could raise its LTC premiums; Defendant's intent in not providing specific language in uniform LTC insurance documents regarding the effect

of underpricing of LTC policies and incorrect lapse assumptions; Defendant's plan to shift risk of its underpricing to Plaintiffs through premium increases; AEGON USA's effort to reinsure or sell Defendant's LTC division; AEGON USA's decision to exit the LTC insurance market; AEGON USA's decision to increase LTC premium rates to shift risk of underpricing to Plaintiffs to meet corporate goals; management pressure on the LTC division to meet profitability benchmarks; the timing of Defendant's awareness of "the significant deviation between the actual experience of the LTC block from the lower lapse assumptions used in pricing the LTC policies," *Id*. at ¶ 4.I; and an associate actuary's original pricing of LTC policies, intentional use of low lapse rates and known effect of low lapse rates.

### C.  *Necessity and Materiality of Plaintiffs' Proposed Merits Discovery*

Plaintiffs contend the court should grant the Rule 56(f) Motion because the Scheduling Order has not permitted them to conduct discovery into any of the arguments Defendant raises in the Summary Judgment Motion.  Defendant argues summary judgment is ripe despite Plaintiffs' limited discovery because numerous aspects of the Summary Judgment Motion present legal questions the court can resolve without the proposed discovery Plaintiffs seek.  Because the court shall dismiss the case in its entirety based on the legal authorities and arguments related to Defendant's disclosure of the possibility of premium increases and the tort of bad faith, the court need not address any other matters in the Rule 56(f) Motion.  Accordingly, the court's consideration of the Rule 56(f) Motion is limited to the two issues discussed below.

### 1.  *Defendant's disclosure of right to increase premiums*

Defendant contends Plaintiffs' actual and constructive fraud claims should be dismissed because Defendant's LTC policies, as well as other documents Defendant provided to Plaintiffs, "clearly disclosed that rates could increase."  Motion for Summary Judgment at ¶ 5.  Defendant argues this disclosure prevents Plaintiffs from arguing they

reasonably relied on representations or omissions leading them to believe they would not be subject to any rate increases. Defendant contends this disclosure warrants dismissal of the fraud claims because, as the Third Circuit Court of Appeals held in a case nearly identical to the case at bar and filed by the same attorneys who presently represent Plaintiffs, none of these documents "'contained any false or misleading representations, and [the LTC insurer] did not have any duty to disclose the possibility of future premium increases or the underlying actuarial assumptions for that possibility.'" Motion for Summary Judgment at ¶ 7 (quoting *Alvarez v. Ins. Co. of N. Am.*, No. 07-1102, 2008 WL 647784, at *3 (3rd Cir. 2008) (alteration in original)).

Plaintiffs' counsel avers merits discovery is likely to reveal information relevant to the "'when, where, how[] and what' of Defendant's fraudulent pricing, sale and renewal of the LTC policies" to better understand Defendant's intent and knowledge regarding its disclosures. Brief in Support of Rule 56(f) Motion (docket no. 169-2), at 10-11. In its Rule 56(f) Resistance, Defendant states, "[t]o rule on [Defendant]'s argument, the Court need only consider the plain language of the disclosures to determine whether, as a matter of law, such unequivocal language negates a claim for fraud." Rule 56(f) Resistance Brief (docket no. 182-1), at 7.

Whether Iowa, Missouri or Virginia law applies, Plaintiffs must show their reliance on the alleged fraudulent representations or omissions was reasonable. *See Bricker v. Maytag Co.*, 450 N.W.2d 839, 842 (Iowa 1990) (requiring plaintiff alleging fraud to show reasonable reliance); *Brown v. Bennett*, 136 S.W.3d 552, 555 (Mo. App. 2004) ("Fraud requires proof that it was reasonable for the plaintiff to rely on the defendant's misrepresentation."); *Lynchburg Commc'n Sys. Inc. v. Ohio State Cellular Phone Co.*, No. CL02-624, 2003 WL 1247053, at *1 (Va. Cir. Ct. Jan. 22, 2003) (quoting *Metrocall of Del., Inc. v. Cont'l Cellular Corp.*, 437 S.E.2d 189, 194 (Va. 1993)) ("[T]o establish fraud, the 'defrauded party must demonstrate the right to reasonably rely upon the

misrepresentation.'").[3]  Discovery into Defendant's intent and knowledge of its disclosures to insureds is not relevant to determine whether Plaintiffs' reliance on allegedly fraudulent statements or omissions is reasonable in light of Defendant's disclosures.  Moreover, Plaintiffs have the evidentiary record necessary to ascertain the nature of the disclosures to which Defendant refers.  Therefore, the court shall deny the Rule 56(f) Motion to the extent it relates to Defendant's disclosures of the possibility of premium increases.

### 2. *Tort of bad faith*

In the Motion for Summary Judgment, Defendant argues the tort of bad faith does not exist under the facts of the case under Iowa law.[4]  "'A covenant is implied in an insurance contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement.'"  *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 51 (Iowa 2003) (quoting *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 33 (Iowa 1982)).  The Iowa Supreme Court has "permitted claims against insurance companies for breach of the implied covenant of good faith by recognizing the *tort* of bad faith in third-party and first-party situations."  *Vos*, 667 N.W.2d at 51 (citing *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 207 (Iowa 1995) (emphasis in original)).  "The tort of bad faith arises in situations where the insurer has denied benefits or has refused to settle a third party's claim against the insured within the policy limits."  *Id.*  Defendant claims the court must dismiss Plaintiffs' tort of bad faith claim under *Vos* because "[P]laintiffs have never made a claim under their policies, let alone had a claim denied."  Summary Judgment Motion Brief (docket no. 163), at 54.

---

[3] *See also Neder v. United States*, 527 U.S. 1, 24-25 (1999) (noting justifiable reliance was an essential element of common law fraud).

[4] Plaintiffs appear to concede Virginia and Missouri do not recognize the tort of bad faith.  Plaintiffs' Brief in Resistance to Defendant's Motion to Dismiss (docket no. 45), at 21.

In the Rule 56(f) Motion, Plaintiffs argue their bad faith claim stems from Defendant's "failure to disclose material defects in its LTC policies at the time of sale and each year when the policies were renewed." Rule 56(f) Motion Brief (docket no. 169), at 14. Plaintiffs believe discovery will reveal Defendant (1) "knowingly passed the costs of its underpricing of the LTC policies back to the policyholder" and (2) "knew that its actions of passing the cost of underpricing and closing the block of insurance to new sales without disclosing these facts to the policyholders [. . .] violated the implied obligation of good faith and fair dealing[.]" *Id.* at 14-15.

Plaintiffs' proposed discovery is not relevant to the subject of Defendant's argument. Plaintiffs do not seek discovery into whether Defendant denied benefits or refused to settle a third-party claim on Plaintiffs' behalf. Instead, the matters on which Plaintiffs intend to seek discovery relate to Plaintiffs' fraud claims. Because the discovery Plaintiff proposes would not rebut Defendant's legal argument on this issue, the court shall deny the Rule 56(f) Motion to the extent it relates to Plaintiffs' tort of bad faith claim. The mere existence of a cause of action is not discoverable. *Cf. McCabe v. Macaulay*, 450 F. Supp. 2d 928, 936-39 (N.D. Iowa 2006) (denying Rule 56(f) motion in part).

### D. Disposition

The court shall deny the Rule 56(f) Motion as to (1) Defendant's disclosure of the possibility of premium increases and (2) the tort of bad faith. Because the court shall dismiss the Complaint on these bases, it need not address any of the other arguments in the Rule 56(f) Motion.

### VII. MOTION FOR SUMMARY JUDGMENT

The court now turns to examine the merits of the two portions of the Summary Judgment Motion that are ripe for the court's review. The court considers (1) whether Defendant's disclosure of the possibility of increased premiums defeats Plaintiffs' claims for fraud and constructive fraud and (2) whether Plaintiffs' tort of bad faith claim must be

dismissed as a matter of law.

### A. Disclosures of Possibility of Rate Increase

#### 1. Actual fraud

Defendant argues Plaintiffs are barred from recovering on their actual fraud claims because Defendant's repeated disclosure of the possibility of rate increases defeats any reasonable reliance on any alleged fraudulent representation or omission of an increase in rates. Plaintiffs argue these disclosures are "a far cry from a clear message the [rates] certainly 'will' be 'increased' due to the known underlying defects in the policies." Summary Judgment Resistance Brief at 35.

In support of its argument, Defendant cites *Alvarez*, 2008 WL 647784, that, although a non-precedential opinion, is on all fours with the instant action and filed by same attorneys who filed the Complaint. In *Alvarez*, the plaintiff raised fraud allegations nearly identical to those at issue in the instant action. That is, the *Alvarez* plaintiff alleged the defendant insurance company had defrauded him into purchasing LTC insurance by omitting (1) the policy was initially underpriced; (2) the actuarial assumptions and lapse rates were unsound or based on limited or incomplete data or ignored available data; (3) the original premium was insufficient to support future claims; (4) defendant insurance company intended to seek premium increases for the LTC policies; (5) closing the LTC block would lead to financial losses, creating a "selection spiral" or "death spiral"; (6) defendant insurance company intended to raise its premiums to obtain windfall profits by forcing the insureds to drop LTC policies to avoid future claims; and (7) defendant insurance company intended to pass any risk of loss due to defective underpricing to the insureds in the form of higher premiums. *Compare* Complaint at ¶ 56 (setting forth alleged fraudulent omissions in Complaint); *with Alvarez*, 2008 WL 647784, at *2 (setting forth alleged fraudulent omissions in *Alvarez* complaint).

In addressing whether the defendant insurance company's disclosures about the

possibility of premium increases barred the plaintiff's fraud claims, the unanimous *Alvarez* panel held:

> For one thing, the policy explicitly reserved the right to raise premiums [and. . .] no representation was made that the right to raise premiums would not be exercised or that there was no plan to do so in the future. Moreover, the only limitation on that right was that premiums must be raised on a class, not an individual, basis, and that they could not be raised until after payment of the first premium. Even if [defendant insurance company] knew that premiums would increase, the policy explicitly authorized such an increase and [plaintiff] cannot seriously claim to have been misled into believing that would never happen.
>
> Second, contrary to [plaintiff]'s interpretation, the policy was guaranteed renewable, not guaranteed affordable. The guaranteed renewable clause meant that [defendant insurance company] could not cancel a member's policy unilaterally for any reason, unless the member failed to pay the premium. This guaranteed the right to renew the policy, not the financial ability to renew the policy, and did not imply that premiums would never increase, or that they would only increase by a limited, affordable amount.
>
> Finally, neither the policy nor the promotional materials represented or implied that expert actuaries calculated the premiums, nor did they contain representations regarding the underlying methodology for calculating premiums. The policy merely stated that 'rates are based on attained age on date of issue and this base does not change with age.' Similarly, the policy did not contain any representations, either explicit or implicit, regarding the financial soundness of the calculations, or future projections for premium calculations.

2008 WL 647784, at *3. The court agrees with the analysis set forth in *Alvarez* and adopts it in full. Defendant's numerous disclosures of its right to raise premiums negates any alleged misrepresentation or Plaintiffs' reasonable reliance on a belief their rates would not

increase. Also, *Alvarez* is consistent with Iowa law: "A harsh result or [p]laintiffs' failure to read or fully understand the contract prior to signing it does not allow [p]laintiffs to avoid the contract terms." *Nelson v. DeKalb Swine Breeders, Inc.*, 952 F. Supp. 622, 627 (N.D. Iowa 1996) (Melloy, C.J.).[5]  Under *Alvarez*, Plaintiffs cannot avoid the repeated, unequivocal disclosures in various insurance documents they received prior to and during their insurance contracts notifying them of the possibility of premium increases. The fact Plaintiffs ignored these disclosures, disregarded them as "boilerplate" or failed to read them does not render them meaningless.

Plaintiffs argue the court must infer or presume the elements of fraud when it is sufficiently pled and essentially disregard Defendant's disclosures. However, Iowa, Missouri and Virginia do not recognize such a presumption. *See Vos*, 667 N.W.2d at 54 (refusing to apply presumption of reliance in fraud class action against insurance company); *Stewart v. Kirkland*, 929 S.W.2d 321, 323 (Mo. App. 1996) ("Fraud is never presumed, but must be proven."); *Henderson v. Henderson*, 495 S.E.2d 496, 499 (Va. 1998) ("Fraud, whether actual or constructive, is never presumed and must be strictly proved as alleged.").

Plaintiffs cite a litany of cases purporting to support their position, none of which the court finds persuasive or applicable. For example, in *Patterson v. Wuestenberg*, 32 N.W.2d 209, 211 (Iowa 1948), the Iowa Supreme Court held it would *not* presume reliance. 32 N.W.2d at 211. Rather, *Patterson* stated in *dicta*, without support, that a presumption of reliance may be drawn in "some circumstances." *Id.* Plaintiffs also cite

---

[5] *Alvarez* is also consistent with Missouri law and Virginia law. *See Empire Gas Corp. v. Small's LP Gas Co.*, 637 S.W.2d 239, 244 (Mo. App. 1982) (holding contract directly contravening prior alleged inconsistent fraudulent representation defeated misrepresentation claim); *First Nat. Exch. Bank of Va. v. Johnson*, 355 S.E.2d 326, 329 (Va. 1987) (holding bank owed no duty to contracting party "to explain that which was perfectly obvious even to the most casual reader").

*Loghry v. Capel*, 132 N.W.2d 417, 421 (Iowa 1965), which involved the narrow issue of a seller's failure to disclose a known defect in real property in a real estate transaction. 132 N.W.2d at 421. The issue of latent defects in the sale of real property is not at issue in the instant action.[6] Therefore, *Loghry* is not applicable.

Plaintiffs also cite *Spark v. MBNA Corp.*, 178 F.R.D. 431, 435-36 (D. Del. 1998) for the following proposition: the "court may presume reliance where it is logical to believe that a reasonable person—or insured—would attach importance to the omitted fact in his choice of law of action on the transaction in question." Resistance at 36. *Spark* followed precedent from the Third Circuit Court of Appeals, which, in *class action certification proceedings*, permits a court to presume reliance in a fraud action "where it is logical to do so" to determine whether questions of law or fact predominate over questions affecting individual members. *Spark*, 178 F.R.D. at 435 (quoting *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir. 1981) (overruled on other grounds relating to statute of limitations for violations of the Securities Exchange Act of 1934)). *Id.* However, *Spark* involved a decision on class certification, which applies an entirely different standard than the instant Summary Judgment Motion. For purposes of the Summary Judgment Motion, the court must decide whether there is a "genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The question is not whether there are questions of law or fact predominating over issues affecting a potential class's individual members. Accordingly, *Spark* is inapplicable.

Plaintiffs also argue Defendant's understanding of the impact of the disclosures

---

[6] *See Jensen v. Sattler*, 696 N.W.2d 582, 585 (Iowa 2005) (discussing Iowa Real Estate Disclosure Act (Iowa Code chapter 558A), which "requires persons interested in transferring real estate to deliver a written disclosure statement to prospective buyers" which "must include" information about "the condition and important characteristics and structures on the property").

"renders any 'guarantee' of renewability utterly valueless[.]" Summary Judgment Resistance Brief at 37. Plaintiffs contend the policies "did not prove to be 'guaranteed renewable' as promised by [Defendant] because the premium increases were extreme," and, "in effect and as a practical matter, [. . .] were not renewable." *Id.* at 36-37. The court disagrees with Plaintiffs' understanding of the "guaranteed renewable" language in the Plaintiffs' policies. This issue was squarely and succinctly addressed by *Alvarez* as follows: "the policy was guaranteed renewable, not guaranteed affordable." 2008 WL 647784, at *4. The court agrees with *Alvarez* and will not read a guarantee of affordable premiums into the insurance contracts.

Finally, Plaintiffs make a half-hearted effort to evade *Alvarez* by arguing it "was decided under the laws of the District of Columbia, which do not apply here." Plaintiffs' Summary Judgment Resistance Brief at 39. However, Plaintiffs do not suggest *Alvarez* was decided incorrectly and do not describe how the laws of the District of Columbia differ in any way from the laws of Iowa, Missouri or Virginia.

For the foregoing reasons, the court shall dismiss Plaintiffs' actual fraud claim.

### 2. *Constructive fraud*

Defendant also argues the court should dismiss Plaintiffs' constructive fraud claims in light of *Alvarez*. Curiously, Plaintiffs do not provide any resistance whatsoever to this argument.

In *Alvarez*, the Third Circuit Court of Appeals dismissed a constructive fraud claim practically verbatim to the constructive fraud claim at issue in the instant action. *Compare Alvarez* Complaint, Def. App'x at 1403-1405, ¶¶ 75-85 *with* instant Complaint at ¶¶ 80-90. The applicable case law in *Alvarez* required a plaintiff to show the existence of a "confidential relationship" between the parties to prevail on a constructive fraud claim. *Alvarez*, 2008 WL 647784, at *4 (citing *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 461 (D.D.C. 1997)). "A confidential relationship is characterized as one where one

party is able to 'exercise extraordinary influence over the other.'" *Id.* (quoting *Witherspoon*, 964 F. Supp. at 461)).

Like the case law at issue in *Alvarez*, Iowa law requires a fiduciary or confidential relationship between a plaintiff and defendant in constructive fraud cases. *In re Estate of Atkinson*, Nos. 9-209, 98-1379, 1999 WL 823564, at *3 (Iowa App. Oct. 15, 1999) (citing *Slocum v. Hammond*, 346 N.W.2d 485, 493 (Iowa 1984)). Missouri law also requires a special relationship for constructive fraud. *See Kratky v. Musil*, 969 S.W.2d 371, 377 (Mo. App. 1998) (noting the breach of any promise in a fiduciary or confidential relationship "will be considered constructively fraudulent," but "the existence of a business relationship does not give rise to a fiduciary relationship").

*Alvarez* reasoned "[t]here was simply no confidential relationship at the time of the allegedly inducing conduct, and, in the absence of a confidential relationship, the constructive fraud claim must fail." 2008 WL 647784, at *3. Like *Alvarez*, the court finds there is simply no evidence of a special relationship between Plaintiffs and Defendant at the time the allegedly fraudulent omissions were made. Indeed, Defendant does not even argue any such special relationship exists. Absent this special relationship, the constructive fraud claim must fail under Iowa and Missouri law.

Although Virginia law does not appear to adopt the "special relationship" test, no constructive fraud claim would lie under Virginia law under the facts in this case. In Virginia, "[a] finding of either actual or constructive fraud requires clear and convincing evidence that one has represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this representation." *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994) (citing *Jefferson Standard Life Ins. Co. v. Hendrick*, 27 S.E.2d 198, 202 (Va. 1943)). As set forth in Section VII.A.1, it is unclear how a "reasonable person" would have relied on any omission as to increases in premiums when Defendant clearly disclosed such premium

increases could occur. Accordingly, in the event Rakes's constructive fraud claim is governed by Virginia law, it fails as a matter of law.

The court also agrees with an alternative analysis the *Alvarez* district court employed in dismissing the constructive fraud claim, which was affirmed by the Third Circuit Court of Appeals. In its consideration of the "special relationship" argument plaintiff raised (which was not raised in the instant motion), the *Alvarez* district court held the defendant insurer "has no obligation to disclose its future rate plans" and "certainly has no obligation to disclose the actuarial basis for its premiums[.]" *Alvarez v. Ins. Co. of N. Am.*, 2006 WL 3702641, at *4 n.10 (E.D. Pa. Dec. 12, 2006). "That information would not only be of no use to all but the most financially sophisticated insureds, it would also require [defendant] to disclose proprietary calculations." *Id.* The Complaint in the instant action involves a constructive fraud claim nearly identical to that at issue in *Alvarez*. Like the district court in *Alvarez*, the court finds the alleged fraudulent omissions relating to Defendant's actuarial assumptions and plans for rate increases would have been of no use to the Plaintiffs. Stated another way, it is unclear how the disclosure of such highly technical, sophisticated financial information would have been material to Plaintiffs in deciding whether to purchase the policy.

Accordingly, for the foregoing reasons, the court shall dismiss Plaintiffs' constructive fraud claim.

### B. Tort of Bad Faith

Defendant argues Plaintiffs' tort of bad faith claim must be dismissed pursuant to Iowa law. "'A covenant is implied in an insurance contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement.'" *Vos*, 667 N.W.2d at 51. "The tort of bad faith arises in situations where the insurer has denied benefits or has refused to settle a third party's claim against the insured within the policy limits." *Id.* Defendant claims the court must dismiss Plaintiffs' tort of bad faith claim

under *Vos* because "[P]laintiffs have never made a claim under their policies, let alone had a claim denied." Summary Judgment Brief at 54.

Plaintiffs do not substantively respond to Defendant's argument as to the *tort* of bad faith. Instead, Plaintiffs make an argument going to a *contractual* claim for a breach of the covenant of good faith and fair dealing. *See* Summary Judgment Resistance Brief at 52 ("every Iowa contract contains an implied covenant of good faith and fair dealing"). Essentially, Plaintiffs argue Defendant "'injured' the rights of the Plaintiffs in receiving the benefits of their initial bargain," and "[d]ue to rate increases, the [P]laintiffs were, as a practical matter, unable to obtain the full benefit of the LTC policies they originally purchased[.]" *Id.* at 53-54. This is not a claim or argument for the tort of bad faith, but rather, a claim for a breach of the contractual covenant of good faith and fair dealing reiterating Plaintiffs' fraud allegations. If Plaintiffs wanted to file a claim for breach of the implied covenant of good faith and fair dealing, they should have pled it in the Complaint. Instead, Plaintiffs pled a "Tortious Breach of Implied Covenant of Good Faith and Fair Dealing (Bad Faith)" and claimed they were "entitled to punitive damages" as a result of this tort. Complaint at 33 and ¶ 96.

The court agrees Plaintiffs have not and cannot satisfy the elements of the tort of bad faith because Plaintiffs have not alleged and Defendant has shown it has neither denied Plaintiffs any benefits nor has it refused to settle a third party's claim against Plaintiffs within the policy limits. *Vos*, 667 N.W.2d at 51. Accordingly, the court dismisses Plaintiffs' claim for "Tortious Breach of Implied Covenant of Good Faith and Fair Dealing (Bad Faith)."

## C. Disposition

The court shall grant the Summary Judgment Motion as to (1) Defendant's disclosures of the possibility of premium increases and (2) the tort of bad faith, dismissing all of Plaintiffs' claims. Because this disposes of all claims in the Complaint, the court

need not address the remaining issues in the Summary Judgment Motion.

## VIII.  CONCLUSION

For the foregoing reasons, the court rules:

a)      Plaintiffs' Rule 56(f) Motion (docket no. 169) is **DENIED**;

b)      Defendant's Summary Judgment Motion (docket no.145) is **GRANTED**; and

c)      Plaintiffs' Complaint (docket no. 3) is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**DATED** this 20th day of June, 2008.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA